Good morning, your honors. Before starting, I'd like to reserve six minutes for rebuttal, if I may. Okay, that's up to you to maintain the time, but we'll try to remind you. Go right ahead. Thank you. May it please the court. Forty-four years ago, two companies on Sunset Boulevard signed a contract governed by California law. Dennis Lambert, on behalf of his company Haven Records, which is now the Plaintiff Overrated, signed a contract with his friend Al Corey of RSO Records, which is now the Defendant's. Haven transferred mass recordings, including what was soon to become the hit song, Baby Come Back, in exchange for $75,000 and an obligation to pay royalties forever. Today, we're here to address the royalty accounting under this contract, which has gone far astray. Subject to your honors asking questions and time constraints, my presentation is three parts. First, I'll let you summarize the claims and issues in the appeal. Second, I'll address some economic and policy implication should overrated lose. And third, I'll further address the legal issues. First, to summarize the case. Well, I think we know the case, having studied it. I want to focus on your skimming theory because that seems to be the heart of your appeal here. I guess my question for you is, I'm looking at the contract, section 13, and I know that the provision you're most focused on is 13C5, but where in the language would you point us to that supports your client's position that essentially they needed to have an at-source royalty payment here and not some kind of net royalty payment for the type of usages we're talking about? Well, the contract doesn't specify at-source or at-net. It's not one of those type of contracts. But if you look at the definition of territory, territory is defined as the US, the UK, and Canada. I believe that's on page one of the contract. So what was done here, which is really bizarre, is the contract was transferred to a company outside of the territory. In fact, it was transferred to a company in Holland, which is part of the foreign territory. The contract defines the rest of the world as foreign territory. I'm just not sure what that has to do with this. I mean, the language I've been focused on, which is the language that the district court focused on, was the amounts received by us. And your friend on the other side says, we took the amounts received by us, we applied the 19% royalty rate, and that's what overrated was entitled to. So why is that wrong? Well, if overrated is to lose this, then what would it amount to would be like a judicial blueprint for theft. Anybody could do the same thing. Anybody with a similar contract, with any contract involving royalties, or a contract that involves a payment based on revenues, like a commission contract or oil and gas, all they have to do is just create a third party, if they don't already have an affiliate, and assign that affiliate a task, such as collect monies. Let that third party keep some of the monies for doing that task, and then pay on what's left over. And that's what's happened in this case. Right, but your clients had audit rights. I mean, if your clients wanted to exercise those, and it turned out that the affiliates here were taking an exorbitant fee, you may well have a claim for that, but that's not what you're really arguing. Well, this is not a statute of limitations case. Statute of limitations isn't before this court, and this is an effect in audit. My client found out that this was happening, and once the client found out that this was happening, they filed a lawsuit. Now, as we point out in the motion, not in the motion, in the appeal, it's one thing to expect maybe some deductions for a foreign territory. If RSO Records did a deal, say, with Japan or Australia or Brazil, and RSO Records, that's a foreign territory, they were expecting to get less monies in the foreign territories. But these companies that contracted, they were both based in Los Angeles. And the expectation was that the biggest royalties would come from the U.S. So it's one thing to justify, yeah, in a foreign case, and deal in a foreign territory, it may be justifiable. You could argue you could do that. But this is in the U.S. So anybody could just do this. And if you take the defendants, if you take their logic to the extreme, then it produces an absurdity, and absurdities are to be avoided under the construction. When you look at Section 13 of this contract, there are lots of different types of things that are being sold. And it's fairly specific about how you're supposed to go about calculating these. And in some instances, it's talking about records sold, and it's talking about whether those are sold by us or our licensees. But when you get down into C-5, which is what I understand your claim to really be based on here for the types of usages we're talking about, it says the amount received by us. And it's in the context of not a sale of records, but a licensing of the master recording. Yeah, but it also says before that it says licensed by us, just before it, and received by us. So the licensed by us and the received by us, the us has to be parallel. It has to be consistent. In this case, the licensed by us is actually what they're doing. It's licensed actually by an affiliate, and it's received by the affiliate. So they should get, my client should get... Right, but they're allowed to do that under the contract, right? They are allowed to use an affiliate. The question is just how do you calculate the loyalty when they do that? Well, you know, yes, the assignment clause allows them to assign this agreement to an affiliate, but the assignment clause doesn't say, doesn't give them permission to change how they delegate their duties. We don't care who they assign it to, just as long as they perform as they're supposed to. In other words, this contract has a credit clause where they're supposed to get production credit produced by a producer. If they assign the contract to somebody else, it doesn't mean the S&E can do what they want with the production credit. It's the same thing, too. They can assign this contract to anyone they want that's an affiliate, but they have to keep accounting as the RSO agreed to. The other thing, it's real important to look at the alter ego part of this case. This is the single enterprise liability. They're all the same, and this distinguishes the Joe Bean case, which was brought up by defendants. Their alter ego was not raised. Here, this is clearly a single enterprise, what's going on here. Now, what's key in the single enterprise aspect of this case, which the courts below were just mistaken about, they didn't realize that under California law, the key aspect of single enterprise is to avoid an inequitable result. Now, I know defendants raised some other cases where other courts have said it was no big deal, but in those other cases where they raised it, where other courts said it's no big deal with the alter ego, with UFG, there was no reference to an inequitable result that would follow. Here, we have a terrible inequitable result that would follow, and you just can't use affiliates to basically create a scam, the scam off the top. If they truly were independent, which they're not, but if they were independent, this would be a different case. But they're not independent, and what makes it even worse is we've had this, what we call it in the blank, the geographical switcheroo. What's crazy about this case is the U.S. is the biggest territory for sales of baby come back. Holland's a tiny country, but the way the contract would now work is if there was a sink license issued in Holland, say on an Amsterdam television show, my client would get 100%, 19% of 100% of those revenues. But if a sink license was issued in Los Angeles, where the contract was entered into, my client only gets 19% of 75%, and that's crazy. They just switched it. It's a show game, and I'm not arguing in general. You can never, I'm not saying in general it's incorrect to never have foreign deductions. This is not a foreign deduction in the sense that it's made the U.S. the foreign country and Holland the home country, but the contract page one defines the U.S. as the home territory, and they've just switched that around. And then if you take their arguments to the extreme, I mean this 25% came out of thin air. They could just say, well, we're going to allow the recipient company, in this case it's UMG Reporting, we'll let them keep 90% and then have them just remit 10% to Holland. And out of that 10%, my client would get 19%. 25%, it's nowhere in the contract. It's just out of thin air, and it's a question of interpreting this contract fairly and not avoiding an absurdity. I guess I still don't understand. Your client has the right to do an audit, and if you did that audit and exercised your audit rights and found out that lo and behold a licensee is taking 90% off the top, you could go to UMG and raise that issue and argue that it either violates the contract perhaps or that it's somehow commercially unreasonable, but that's not what you're arguing here. Your client's not saying 25% is somehow improper or commercially out of line. We are saying that, Grant, and we did the audit. The audit was we found out what was happening and we sued. The 25% is unreasonable in this case because it's not 25% of sales, say, in Australia. It's 25% deduction for sales in the U.S. And this brings up, again, the comment of good faith and fair dealing, which basically the defendants, they have total discretion here, and they're using their discretion unfairly to just take 25% off the top in this case. And that's a breach of the common good faith and fair dealing. And we also brought up the single enterprise liability too. Counsel, does your argument, you've mentioned the single enterprise liability. You've also mentioned the alter ego doctrine. Does your argument depend on the fact that these companies are related, that they're affiliated? Yes. They're one and the same because that's what makes this so unfair. Okay. But the affiliation question was addressed both by the state court and by the district court. And the state court found that there was no evidence of an alter ego problem here. Well, the state court made a mistake. Well, you're going to have to tell us that that is clear error. Not just wrong, but clear error. And it's been compounded by the fact that the district court reviewed that and said, I can't find any reason to overturn this. I don't see any reason at all for disagreeing. Well, it's clear error because of the uncertainty that results in this thing. I mean, basically. Tell me why it's clear error to find that these are not alter egos. I'd like you to frame it within the alter ego doctrines. The alter ego doctrine is concerned about finding, preventing an inequitable result. And I quote the case of Cohn versus Cohn, which is quoted by Messler, the California Supreme Court. And it talks about preventing an inequitable result. And in the language of Cohn versus Cohn, it says, there's nothing wrong with having single entities and doing certain things with it. But it's how the single entities are operated in a particular case. And in this particular case, an inequitable result occurs. But even without the single, I'm sorry, I may have misspoke. Even without the single enterprise. Yeah, I'm a little puzzled. I understand that inequity is one of the goals of the alter ego doctrine. But that's not the test for alter ego, for determining an alter ego. It's something that the alter ego doctrine is designed to prevent. But it's not the test for determining. We don't just look at things and say, well, in our view, this doesn't feel equitable. So there must be an alter ego problem. Well, you know, there's single enterprise and alter ego and the different tests for single enterprise and for alter ego. Single enterprise, you don't have to look at the whole alter ego thing. You have to look at the single enterprise to integrate. Are they an integrated entity? And they are. You don't have to go through all those factors. Some factors are relevant in some cases, but some not. Are you saying the single enterprise doctrine is easier to satisfy than alter ego? Absolutely. So what do you have to show in order to show that there's a single enterprise? And tell me where the state court and the district court here, where they made findings that are clear error. So the district court basically didn't even discuss the single enterprise liability. And the district court confused the single enterprise liability with alter ego. And it looked at things like whether or not they keep separate bank accounts. But it looked at the main thing. Judge Doyle, in the very beginning of the case, he said that apparently the defendants are an integrated enterprise. And then he just forgot what he said. And then he ruled that it's not an alter ego liability. It doesn't apply. But if I could, I'd like to go back. I don't believe that's determinative because I believe on the, if you give the excerpts from the California code, civil code, which I put in the addendum, that if you interpret the contract reasonably and to prevent an absurdity, we should win. We should win in all of that. I know, Mr. Machado, you had wanted to do six minutes for rebuttal. And since we've taken you to four minutes, I'll flag the issue for you and see if you want to let your other friend go and you can save the rest of your time. Yes, I'd like to save the rest of my time. Thank you. Mr. Goldman, we'll hear from you. Good morning, Judge Feige, Judge Cardone, Judge Bress, and may it please the court. Judge Bress, I think that you could have been reading from my own notes because I think you hit the nail on the head on the analysis here. Their argument is not that 25% is an unreasonable fee for a licensing agent to take. Again, there are two types of contracts of this sort. There's at source and there's net receipts. This is clearly a net receipts provision unambiguously. It says the amounts received by us. And RSO records from the very beginning had the right to use licensing agents and to pay the 19% based on the amounts that RSO received, the net, not the gross. And there's a reason why you're not seeing in the record any sort of expert report or declaration that says that I'm an expert in the music licensing field and 25% is an unreasonable rate and that's excessive and it shouldn't be that high because there's no such evidence and that wasn't their theory. Instead, the appellant went for, to use a baseball analogy, the home run here. They said I don't care if the rate's 1% or 25% or 99%. It's not permitted at all. This is really an at source contract and RSO has to pay us our 19% on the gross amount of the license. And that's just not what the contract says. And so having decided to bypass any attempt to factually show that 25% is unreasonable, they went right to the two arguments that would not allow UIMBV, my client, to take any fee at all. There's a lot to this. I mean, you know, we were focused on C5, right, because that's the basis of this claim and that uses the language amount received by us. There are obviously other provisions higher up in paragraph 13 that some of them are key to the retail list price, but then some of them do refer to percentages based on the net royalty. So they're sort of more explicit in talking about net royalties, which is essentially what you're arguing C5 means. So I guess the question is, given that the contract elsewhere uses net royalty rate with a greater degree of specificity, why do you think C5 sort of incorporates the same concept? Well, let me take a step back, because originally I had that in my notes and I jumped ahead because of the comments that you made, Judge Bress. But yes, the way the contract is structured, 13A, there are many royalty provisions, as you pointed out, but they basically fall into two categories. There's the sale of records, which is governed by 13A, and then there are various types of licenses, and certain types of licenses are also governed by 13A because it talks about records sold by us or our licensees, but then other types of licenses, for example, licenses to put the music in a movie or something, that would be governed by various of the other provisions of 13C or D or whatever. So the language you're referring to, I believe, is in the sale of records section, 13A. And so if RSO, now UIMBV, is selling records, or its licensees are selling records, let's say iTunes is a licensee and it's selling a record, then 13A is the governing royalty rate, and we've been paying that royalty rate consistently. If one of the particular types of licenses from 13C, 13C Roman numeral V, for example, comes into play, like a license is granted for the use of Baby Come Back in a movie, then Mr. Lambert gets 19% of what RSO or UIMBV receives from that. And by the way, the 19%, just if you're curious, that didn't come out of thin air either. That was a division between Mr. Lambert's 19% and 31% for the band player. So if you were to look at the other contract with the band, they get 31%, he gets 19%, and RSO gets 50% of what the net amount it receives. So that's the explanation of... What do you do? I mean, just C1 is 13, C1 is not the focus here, but that one says, again, it's talking about record sold, but it says, it makes a reference to one half of the net royalty which we shall receive from any licensee. So that one does use net royalty. I mean, is the difference that when we get to C5, we're not talking about record sold, we're talking about a master, and we're talking about both flat fees and royalties, and the nature of that transaction looks a little different? Yeah, I think that record companies tend to use net royalty and net receipts somewhat interchangeably, but they're not entirely interchangeable. Because when you license for a flat fee, for example, that's not a royalty, that's a flat fee. So if they're talking about net receipts from something, it may not be a royalty, it may be just a receipt, it may be a flat sum of $10,000. So I think when they use net royalty or net receipts, it just depends on the context, but ultimately, in terms of dollars and cents, it's the same thing. It's the amount of money that the company, RSO or UAMPB, receives. It's the revenue they receive or the royalty they receive. But either way, it's still dollars. So, again, the only arguments that they made here were looking for this home run, that RSO and UAMPB are not allowed to charge any fee at all, is, first, the alter ego theory. And, by the way, it's clear that alter ego and single enterprise are the same test, with two different names. The state court there didn't get it wrong. The Toho Toa case from California tells us that they're the same test, and they didn't prove their case. And, in fact, they barely appeal that issue. It takes until page 63 of their brief to even get into the alter ego issue, and then they discuss it only for a few pages. And they don't even address the evidence, if there was any. They only talk about, well, the judge didn't consider single enterprise. That's just not the case. And, in fact, the reason they lost is because the only evidence they really had was the fact that, well, there's a website that says Universal Music Group and calls it a company. But we've cited numerous cases that say that's not enough. Puffery on a website calling us a company isn't enough to prove alter ego. What's your response to your friend's argument on the other side, that the contract would allow your client to basically enter an agreement with someone who took 99% off the top, and they would have no recourse? Well, again, that's not this case. But I would say that if this case involved facts, if, as you point out, Judge Press, if they had audited and found that we were taking 99% or that, let's say, Universal France was demanding that UIMBV pay it 99% of any license fee and remitting only 1% of the license fee, the gross fee to UIMBV, I would think, in that hypothetical, that they would have had a better alter ego case because then it would look like Universal France was exercising overweening power over UIMBV and misusing UIMBV's corporate structure for its own purposes. So that might have been a different case, but, of course, that's not the case here. I also note that if that were happening all around the world, I would think the taxing authorities in all these countries would be very interested in that because I don't think that, just as in the U.S., I don't think that the Dutch taxing authorities are going to appreciate if someone is artificially moving 99% of a license fee that really belongs to a Dutch company and should be taxed against a Dutch company to France or somewhere else. So I think the case would have been very different if that were the rate. And, again, they haven't challenged the 25% rate as though that's an unfair rate. They didn't do that. They're simply saying we can't take any fee at all, that the affiliates, the licensing agents can't take a fee at all, or if they do, Mr. Lambert's entitled to be paid at source. And, as I mentioned... Does that show that 25% is actually the amount that's being taken, or is that more just supposition about what it might be? Well, we never had to address that. I'd be totally comfortable if this was a different case, arguing and trying to win that issue because these rates are actually set at market rates. I mean, both because the taxing authorities would otherwise have an issue with that somewhere in the world and also because these affiliates do negotiate with each other. These rates are reciprocal. So if UIMBV is going to use a company in a different country to help it procure a license, because UIMBV has no expertise, for example, in getting a license on French television or on Belgian television, that's not their area. So they need a licensing agent, whether affiliated or unaffiliated, to help them with that. And, by the same token, if Universal France wants to procure a license for a TV show in Holland, they need the expertise of UIMBV. And these rates are determined reciprocally, and there are individual human beings at each company that are trying to get bonuses and trying to be profitable and trying to keep their jobs and be promoted, and they all have an incentive to not pay out unfairly amounts. But, again, that could have been an issue in a different case that could have been more elaborately litigated. But the appellants are the masters of their own claim, and what they chose to argue here was not that 25% should have been 19% or 22% or 5%. What they chose to argue was the home run, that 1% would have been too much. Well, some flavor of their argument, I think, is something to the effect of, you know, it's a heavily negotiated contract. We're talking about percentages, half percentages. These monies, you know, little percentages matter. And if we were going to have an agreement where you could do something with an affiliate who took 25% off the top when it comes to the synchro sales and licensing, that would have been spelled out in greater detail than what's here. So how do you respond to that? Well, as I think you pointed out earlier, the agreement doesn't distinguish between licensing agents being affiliates or non-affiliates. In fact, if you look at the agreement and you look at the situation in 1977, RSO Records was itself an affiliate of a British record company. RSO Records Limited, which was co-owned by Polygram, a Dutch record company, and Robert Stigwood, a UK-Australian entrepreneur, the guy who created Grease and Saturday Night Fever and signed the Bee Gees. So the contract already had an international flavor to it. The base of RSO was in the UK. It may very well be, and I'm too young to have been around them, but it may very well be that in 1977, RSO Records, Inc., located in California, was already using licensing agents in the U.S. to procure licenses because RSO Records, Inc. may not have had the resources on its own to do in-house licensing or the expertise. And RSO Records, Inc. may have been charged a fee by those agents. So from the very beginning of this contract, Mr. Lambert might have been charged a fee by third-party licensing agencies that was passed on to him, and the real truth of the matter is, I mean, the point is that RSO Records, Inc., under the contract, had that right. They had the contractual right to pay on the net that they received. And so then you say, well, but then in 1984 or 85, they began using affiliates to license, to help them license. And again, the only difference between an affiliate and a non-affiliate doing the licensing is if the affiliate is somehow exercising overweening bargaining power or using the affiliate for its own purposes. That goes back to the alter ego claim. Are these affiliates dealing at arm's length, or is one of them dominating the other? And that's the issue that they tried to litigate before the state court, and then the district court both agreed there was no such evidence. I have other issues I could discuss, but unless the court has any questions, I'm happy to yield the rest of my time. Let me ask my colleagues if they have other questions for Mr. Goldman. I don't. I think Mr. Goldman was satisfied. The court doesn't have any questions at this time, and we'll hear a rebuttal. Thank you. Thank you, Ron. I've heard Mr. Goldman mention royalties or zinc licenses in France and Belgium. However, in this particular case, the documents indicate there's been absolutely no payments, zero payments at all for foreign sales. Foreign sales are defined in the contract that's outside the U.S., the U.K., and Canada. Absolutely no sales, no payments at all in foreign sales. We've attached royalty statements that were given to overrated, and we've attached royalty statements that were given to the ban. And the ban was getting paid for sales outside the home territory and the foreign territory, but overrated was not. We pointed that out, and for some reason, erroneously, the district court said, oh, well, our claim for failure to pay foreign sales was not part of the operative complaint. But it actually is. Paragraph 77E of the second amended complaint, it averts a failure to pay the correct amount due for sales of records. It doesn't say for sales of records in the U.S., U.K., or Canada. It says for sales of records. That includes the foreign sales, and something went wrong. I don't know why all of a sudden we just said in a footnote, well, you know, we'll just treat this as a constructive amendment, but we have it. It's right there. No payment for the foreign sales. I also want to just mention there's a RSO draft of this contract. Any ambiguity has to be construed against them. And, again, we're talking about switching the territories around. The concept that Mr. Goldman talks about using affiliates, that would make sense if we were talking about, if I was complaining about sales in France or sales in Australia. I'm talking about I'm complaining about sales in the U.S. in Los Angeles when the parties that ended into the contract were in Los Angeles, and you need to interpret a contract based upon what is written in the contract. RSO drafted it, but they should be held responsible for the failure to define things. I also want to briefly talk about the digital downloads. The digital downloads, they're mistaken there, too. This circuit has already issued a case where digital downloads is a license. It's not a sale of records. It's a license. And when you look at the definition of device, back in 1977 when the contract was written, 1977, the device was a physical object. And if you look at the surrounding language, the surrounding language talks about devices that are manufactured, distributed, and sold. And there's the conjunctive N. So digital downloads. Device known or unknown. I mean, a device can be something that's intangible. That is a commonly used way of talking about that word. And here it says known or unknown. Well, if we put that into context during the time, 1977, prior to that there were records, and then after records there were A-tracks, and then there were cassettes, and then soon after that came CDs. They were talking about those physical unknown things. They weren't talking about complete intangible. But back to my other point, an intangible is not manufactured. An intangible is not distributed and sold. It's licensed. It's not sold. It's licensed. This circuit has already said that it's licensed. So we should win on that point as well. Also, we asked for an accounting, and we've never got the accounting. The accounting would have proven all this stuff. The Tissell case says an accounting can be a discovery cause of action, and the courts just totally got that wrong. Okay. Thank you, counsel. Your time has expired, and we appreciate very much your arguments this morning and the arguments of your friend on the other side. This case is submitted. Thank you.
judges: Bybee, Cardone, Bress